UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

By: Mary E. Lenti, Esquire
Attorney No.: 029932011
**THE LENTI LAW FIRM, LLC**
137 High Street, Fourth Floor
Mount Holly, NJ 08060
Tel: (609) 265-9604
Fax: (609) 265-9605
Attorney for Plaintiff

RECEIVED

JAN 0 3 2019

AT 8:30 _____ M
WILLIAM T. WALSH
CLERK

FALL RIVER AREA REVITALIZATION
CORPORATION,

        PLAINTIFF,

v.

          COMPLAINT

CITY OF FALL RIVER
        DEFENDANT(s).

Plaintiff FALL RIVER AREA REVITALIZATION CORPORATION ("FRAR"), by their attorney, THE LENTI LAW FIRM, LLC for the Complainant against the Defendant, CITY OF FALL RIVER MASSACHUSSETTS ("CITY"), respectfully allege, upon information and belief, as follows:

### AS TO THE PARTIES:

1. FRAR is a Massachusetts corporation, who business address is 1 North Pavilion Avenue, County of Burlington, City of Riverside, State of New Jersey.

2. Upon information and belief, at all times hereinafter mentioned, CITY, is a municipality, in the State of Massachusetts with a government address of One Government Center, Fall River, Massachusetts 02722.

### JURISDICTION AND VENUE:

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. 1131, 28 U.S.C. and

2

28 U.S.C. 1367 and 28 U.S.C. 1962©, 1962(d) and 1964 (c)

4. Venue is proper in New Jersey pursuant to 18 U.S.C.1965

## FACTUAL ALLEGATIONS

5. On June 22, 2017, FRAR, tendered $10,000.00, in consideration of and prior to the time of an auction, FRAR had a successful bid and won the auction ("AUCTION") that CITY held for the sale of the King Phillip Mill located at 372 Kilburn Street in Fall River, Massachusetts 02724 ("PROPERTY").

4. FRAR had appointed Mr. Richard Derosas ("DEROSAS"), as an officer of FRAR. DEROSAS was acting as the liaison with the CITY and residents, known as the South End Community ("COMMUNITY"). All individuals within the city administration and the various governing bodies were aware that DEROSAS was simply an officer of FRAR, appointed to undertake specific tasks. They were aware that the role of DEROSAS was solely to (a) present the development plan of FRAR to the community, (b) bid at the AUCTION at the sole direction of FRAR and (c) execute the Memorandum of Sale ("MOS") under the direction of FRAR with no ability to undertake any actions without the express authorization of FRAR._As a result of such successful bid, by DEROSAS on behalf of FRAR, FRAR won the auction and the right to proceed with the MOS and the acquisition of the PROPERTY. The CITY was aware, by way of correspondence from the offices of FRAR that DEROSAS was not authorized to make any other decisions, take any actions or make any determinations with regard to the MOS and PROPERTY as well as any other item related to FRAR and the MOS that was executed by the CITY with FRAR.   . As a result of such AUCTION, the CITY executed a binding, contractual agreement the MOS with FRAR for the sale of the PROPERTY.

6. Mayor Jasiel F. Correia II ("MAYOR"), City Administrator Ms. Cathy Ann Viveiros ("VIVEIROS"), City of Fall River Attorney Matthew J. Thomas ("THOMAS") and other officials were aware that DEROSAS was expressly involved by virtue of the choice of FRAR and that FRAR was, without doubt, both the purchaser and entity with which CITY had a binding MOS.

3

6. At the time of the signing of the MOS, CITY had been notified that, prior to DEROSAS executing any documents, such had to be vetted by FRAR and approved for such execution. In fact, THOMAS required that documentation be provided authorizing DEROSAS to execute the MOS. All dealings with the Municipality were clearly indicative and statements were clearly made as to the sole role of DEROSAS being a figurehead with limited authority, which was expressly to speak to (a) speak to the COMMUNITY on behalf of FRAR as its officer and to (b) execute the MOS only. No other documentation was to be executed by DEROSAS, without the express written consent of FRAR.

7. July 25, 2017, FRAR received one or more notices/letters ("Notices") from a city agency as to the city having misappropriated monies, for which return the monies were legally required. Furthermore, the notice further stated that unless a waiver was received, work on the PROPERTY could be delayed, by a certain number of months which were critical to FRAR, if the monies were not returned to either the agency of the state of New Jersey. It was made clear that, if a closing were to occur, and such monies were not paid, FRAR would be exposed to liability, demands for repayment of such monies and a potential deed restriction. FRAR, in turn, requested of the CITY that such monies be repaid to the appropriate parties. It was equally made clear that, if such monies were not repaid, such would be considered misappropriation of funds and fraud, with the latter being evidenced by reasons the CITY gave for obtaining such monies when, in fact, such was clearly not the purpose for which the monies were set forth. The fear of FRAR was that, in the event of a closing, litigation would occur and a deed restriction would be placed upon the PROPERTY with the result being a loss of value and an inability to develop the PROPERTY.

8. There was concern that there other items that were not known to FRAR and for which such liabilities would then attach themselves to FRAR subsequent to closing. Such fear was due to the inappropriate and inaccurate representations of the CITY as to the basis for obtaining such funds and the fact that the CITY would not provide a representation as to their being no other actions taken that resulted in misappropriation of monies, enrichment of any office holders by way of monies that were

4

not due to them.

9. It must be noted that the CITY was aware that its refusal, to return monies to the agency, would result in material damage to FRAR and the Property. The CITY was also aware that the ability of the Historical Commission to delay demolition. Despite multiple queries, as to there being any issues that would impede development, the CITY denied knowledge of any. Despite the request that the monies be returned to the agency, the CITY refused to do so. Despite the request that there be some accommodation in regard to timing, due to the issue of demolition possibly causing delays, the CITY refused to consider it despite the issue of the demolition being delayed, the CITY refused to consider it.

10. In essence, the city decided to take money and not return it, as it was supposed to. The CITY hid two major issues that would have affected its ability to sell the property as well as affect the quick time frame it was seeking.

11. When there is a tax sale, it is common for all obligations to be eliminated, i.e. taxes, liens and etc. The aforementioned could not be eliminated and would survive transfer by way of such sale. The misappropriation of funds and the impact upon the PROPERTY would not have been difficult for any buyer to have discovered. The ability of the CITY to delay matters, due to the issue of demolition, is also something the CITY was aware of and chose to hide. Yet, even after such was brought to the attention of the CITY, it chose to completely disregard (a) the fact that it had not disclosed these issues and (b) refuse to discuss the matter in any respect, despite such being legitimate concerns of any buyer and any seller would have understood and have been opened to such discussion. In essence, the CITY tried to avoid its responsibility as both a responsible seller and to attempt to both deceive the buyer, benefit from its position as the CITY to be able to hide such matters and unadjusted enrich itself by receiving proceeds from the AUCTION, ensuring the outcome of the election and simply being able to eliminate a source of significant obligation and liability, due to the condition of the PROPERTY and the continued drain on its resources.

12. Though the MOS states that the PROPERTY would be conveyed in an "As-Is" condition, such is

5

associated with the physical aspects of the PROPERTY, market conditions and other related matters. Such does not pertain to issues arising out of misallocation of funds and liability resulting from such actions. In the event the "As Is" condition were to truly apply to the issues raising within this Section 12, the CITY would have had no problem with disclosure of such issue as well as dealing with the matter. Instead, the CITY engaged in subterfuge and deception in hiding the issue in the hopes of deceiving FRAR by way of FRAR, unknowingly, and without the possibility of discovering such issue. It was by virtue of a fluke that the FRAR were able to find out about the matter. It is understood that the CITY has attempted to prevent FRAR from finding out about the matter, of both the funds and the demolition delay by virtue of claiming that there was no ability to obtain historic credits on the PROPERTY. By virtue of not being able to obtain such credits, FRAR would have, ostensibly, had no reason to speak with the historic commission and, therefore, discovering these issues that were hidden by the CITY. It was only by virtue of FRAR's repeated attempts to understand the discrepancy between what could be obtain by way of historic credits and the CITY's position, that it had contact with the historic commission which, in turn, sent the letter once it realized that the CITY was not abiding by its legal obligations.

13. Shortly thereafter, FRAR had brought to the CITY's attention the aforementioned concerns, the CITY had decided to conspire with DEROSAS to deprive FRAR of its rights and to publicly defame and slander FRAR in its drive to replace FRAR with a party that was compliant with its underlying agenda. The CITY came to an understand with DEROSAS to replace FRAR as the entity who had the rights to purchase the PROPERTY. FRAR became aware of such sudden change, by way of public announcements by the MAYOR in the press and other media outlets. Under no circumstance, did the CITY provide any type of notice or warning that it had taken such action. The CITY chose to ignore FRAR and to both interfere with and to destroy any rights FRAR had under the MOS that was executed between FRAR and the CITY. In addition to providing no notice of its arbitrary and capricious actions, the CITY also did not offer to reimburse FRAR for any costs incurred, including but not limited to the

6

deposit in the amount of $5,500.00, made at the time of execution of the MOS. Also, the CITY never sent a notice of default, notice of objection or any other reason as to its proceeding with DEROSAS. The CITY ignored a number of calls and emails from FRAR to discuss the matter and to understand why the CITY had taken such actions.

13. The CITY repeatedly ignored FRAR's requests to discuss and possibly remedy the situation. In fact, when FRAR indicated its readiness to close but requesting an extension of time, the CITY refused to provide such extension. However, the CITY did express an intention to provide an extension of time to DEROSAS for closing the transaction. Most astonishingly, the CITY pronounced its intention to provide such extension to DEROSAS by way of press announcement, continuing its intention to maintain DEROSAS as the developer, while completely trampling upon the rights of FRAR to the acquisition of the PROPERTY under a legally-binding MOS.

14. A number of announcements were made, representation was made as to DEROSAS being the developer and it blatantly stated that the CITY was ignoring FRAR. All actions taken by the CITY were in blatant disregard for the rights of FRAR and destroyed its abilities to pursue the acquisition of the PROPERTY as well as any other transactions within the City of Fall River and other areas that were aware that FRAR had a MOS but had mysteriously and without any notice, been unable to perform.

## COUNT ONE

### (Negligent misrepresentation-All Defendants)

15. Plaintiff repeats and re-alleges each and every allegation set forth above with the same force and effect as though set forth herein at length.

16. Plaintiff has complied with all of the obligations, to the Defendant. Defendant had a clear obligation, under the MOS that was executed between the Plaintiff and the Defendant on June 22, 2017, which Defendant clearly breeched.

17. The Defendant's actions and its intentions will be proven by way of testimony from several members associated with the city government and its agencies and/or city council. It will become

abundantly clear that the Defendant had intended to default on the MOS and to do so for a number of reasons including, but not necessarily limited to, the need to escape its obligations to one or more other parties and win the election by way of the votes of the community which were based upon the manner in which the Defendant would portray its success in selling the development and the ability to eliminate certain liabilities and exposure of the Defendant.

18. Defendant faulted under the terms of the MOS.

19. As a result of Defendant's default under the terms of the MOS, Plaintiff has incurred damages and consequential damages at an amount of $62,500,000.00, which will be proven at trial, based upon financial calculations, potential testimony and the standards of real estate development, profit and loss and other measures and valuations.

20. At the time of execution of the MOS, the Defendant was provided with documentation as to the location to which any correspondences and notices should be sent. On November 1, 2017, a Notice of Default was sent by Defendant to the registered agent of the Plaintiff in Boston, Massachusetts by certified mail. The Defendant was aware that such was not a location from which we would receive such correspondence on a timely basis. The Notice of Default was not seen until November 28 2018 via an email sent by the registered agent of the Plaintiff which was in a spam folder. In addition, the notice was not addressed to the Plaintiff, hence, causing even more confusion. Also, the notice states that there was time of the essence within the MOS that is a clear falsehood on the part of the Defendant. The sending of such notice is a clear indication was the Defendant to create the veneer of doing the right thing while, at the same time, achieving its goals as it continues its deception. It is also notable that October 31, 2017 was the date of closing and the notice of default was immediately sent less than 24 hours after such date. In addition, until the date of this notice, there was no other correspondence sent by the Defendant to the Plaintiff, there was no request by the Defendant for scheduling of the closing, there was no response to a number of phone calls and emails to the Defendant by the Plaintiff. In essence, the Defendant chose to ignore all reasonable means to proceed

with the transaction and to attempt to evade its liabilities and responsibility under this transaction.

## COUNT TWO

### (Conspiracy)

21. Testimony will be provided by one or more parties that the Defendant chose to default by virtue of its desire to proceed in a way that was entirely to its liking. The Defendant chose to immediately default and appoint DEROSAS as the new developer without warning to Plaintiff, due to its belief that the process might take longer and adversely effect the ability to obtain votes from the community. Hence, in addition to the desire not to be held accountable for monies which had been misappropriated and to garner votes at the highest level possible from the community, the Defendant chose to default upon the MOS with Plaintiff and pursue matters with a party who was much more pliable and would be subservient to the demands of the CITY and to do whatever he was told to.

22. Plaintiff repeats and re-alleges each and every allegation set forth above with the same force and effect as though set forth herein at length.

## COUNT THREE

### (Tortious Interference)

23 Defendant was aware that DEROSAS had no ability to develop the PROPERTY without Plaintiff, due to the legally binding obligations of both the CITY under the MOS with Plaintiff and DEROSAS as an officer of Plaintiff.

24. Plaintiff received a letter on August 10, 2017 from John H. Cunha, Jr. of Cunha; Holcomb, P.C., attorney for DEROSAS, which confirmed by implication as well as clear statements the aforementioned. Defendant had also received a copy of such letter. Despite its receipt of such letter and its awareness that DEROSAS had no rights to proceed with the Defendant, as well no financial capability to do so, the Defendant chose to proceed with DEROSAS and to blatantly disregard the rights of Plaintiff and to default under the terms of the MOS. In addition, Defendant knew that it would be unable to proceed with DEROSAS, due to DEROSAS's lack of financial capability, as had

been expressly stated in the beginning by Plaintiff at the time that the AUCTION had been won. THOMAS, VIVIEROS and other parties were aware that DEROSAS had a small chance of being able to develop the PROPERTY and yet, they decided to proceed with DEROSAS when the Defendant found the Plaintiff to want to do the right thing by virtue of declaim by the Defendant as well as to work something out, due to the problem which could not have been considered to be "As-Is" conditions, due to such issues being the result of deception and other conduct on the part of the Defendant.

## COUNT FOUR

### (Negligence)

25. Plaintiff repeats and re-alleges each and every allegation set forth above with the same force and effect as though set forth herein at length.

26. Defendant was aware of all of the aforementioned Points 11, 12, 13, 14, 15, 16, 17 and 18.

27 All actions taken by the Defendant were reckless and in blatant disregard of its obligations under the terms of the MOS.

28 As a result of Defendant's actions, in contravention of the MOS and the common rules governing transactions, Plaintiff has incurred damages in the amount of $62,500,000.00.

29. At all times, Defendant had counsel by way of THOMAS as well as corporate counsel by way of Joseph Macy ("MACY"). THOMAS was present at the AUCTION, was completely aware of any and all of the aforementioned points and the actions taken by and blatant disregard by Defendant of its contractual obligations and the damages incurred by the Defendant and the liability that would be incurred by the Defendant. Any attorney would be aware that conduct under a legally binding contract, taken by Defendant, could result in liability and exposure to claims for actual damages and consequential damages.

## COUNT FIVE

**(Aiding and Abetting the Commission of Torts)**

30 Plaintiff repeats and re-alleges each and every allegation set forth above with the same force and effect as though set forth herein at length.

31 Plaintiff had a business relationship with DEROSAS, by way of DEROSAS having been appointed to be President of Plaintiff's corporation and to solely execute documentation at the time of the AUCTION and to present the development plans of the Plaintiff's to the community. Such was the limit of the ability of DEROSAS to undertake any action in regard to the PROPERTY.

32 Defendant was aware of such relationship and the limitations imposed upon DEROSAS by way of his acting as an officer of the Plaintiff. Defendant directly interfered with the ability of Plaintiff to control the actions and to assert its rights vis-à-vis DEROSAS. By arbitrarily and capriciously appointing DEROSAS as the developer, in direct contravention of both the Defendant's contractual obligations, the Defendant caused substantial and material damage to the position of Plaintiff in regard to its relationship with DEROSAS as well as its ability to assert its rights under the MOS.

33 Defendant was aware that its actions were detrimental to the Plaintiff. Defendant also was aware what the consequences would be for the Plaintiff.

34 Any reasonable person, even if not an attorney or someone who undertakes contracts on a regular basis, would realize what the impact would be of such actions that Defendant had undertaken and the consequences, both monetary and non-monetary, to Plaintiff in both financial losses, loss of opportunity and reputation. Claims were made, in the public arena, that were most damaging to Plaintiff.

35 As a result of the foregoing breakdown of the ability of the Plaintiff to proceed, both in terms of the development of the PROPERTY per the terms under the MOS as well as the Plaintiff's ability to do business in the area and the state government, Plaintiff has incurred damages in an amount of $62,500,000.00.

## COUNT SIX

### (Intentional/Fraudulent Misrepresentation)

36 Plaintiff repeats and re-alleges each and every allegation set forth above with the same force and effect as though set forth herein at length.

37 Plaintiff entered into a valid contractual agreement with the Defendant.

38 Defendant had knowledge of the consequences and resulting damages that would be incurred by the Plaintiff, though it was not aware of the amount at the time of its default.

39 Based upon the public announcements by the Defendant, which was so obviously and diametrically in opposition to its contractual obligations under the MOS and its knowledge of the relationship between the Plaintiff and DEROSAS and the limitations of DEROSAS in any actions that he could perform, it is impossible that the Defendant could not be aware of the consequences of its actions.

40 Actions taken by the Defendant caused a breach of contract with such being intentional and improper.

## COUNT SEVEN

### (Punitive Damages)

41 City conspired with DEROSAS to deprive FRAR of its rights.

42 City engaged in conduct for the purpose of Unjust Enrichment inclusive of economic and material gain by elimination of the need to return the $100,000 to the agency, due to having silenced FRAR's objections to such misappropriation of funds.

43 Actions by the City by way of public announcements in the Herald resulted in Slander and Material damage to the Plaintiff.

44 Actions by the Defendant resulting in a successful attempt in Tortious Interference by the Defendant.

45 Actions by the Defendant created a clear rupture in the ability of Plaintiff to hold DEROSAS

12

accountable for liability incurred by way of the violation of his fiduciary obligations to the Plaintiff.

46 As a result of the foregoing and by way of both documentation and financial information, Plaintiff has incurred damages to be proven at trial in excess of $62,500,000.00

## **DEMAND FOR RELIEF**

WHEREFORE, the Plaintiff respectfully requests that judgment may be entered in favor of Plaintiff against Defendants for

A. Compensatory damages

B. Punitive damages,

C. Consequential damages

D. Statutory damages

E. The imposition of a constructive trust upon Defendants

F. Equitable disorgement of all monies unlawfully obtained

G. Interest, attorney's fees, and cost of suit

Date: 12/03/18

THE LENTI LAW FIRM, LLC.

Mary Lenti
137 High Street, 4th Floor
Mount Holly, NJ 08060
lentilawfirm@gmail.com
609-265-9604

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

Date: 12/03/18                                         THE LENTI LAW FIRM, LLC.

*[signature]*

Mary Lenti
137 High Street, 4th Floor
Mount Holly, NJ 08060
lentilawfirm@gmail.com
609-265-9604

By: Mary E. Lenti, Esquire
Attorney No.: 029932011
**THE LENTI LAW FIRM, LLC**
137 High Street, Fourth Floor
Mount Holly, NJ 08060
Tel: (609) 265-9604
Fax: (609) 265-9605
Attorney for Plaintiff

---

| | |
|---|---|
| FALL RIVER AREA REVITALIZATION CORPORATION, : : PLAINTIFF, : v. : : CITY OF FALL RIVER : : DEFENDANT(s). : | DOCKET NO.: PLAINTIFF CERTIFICATION |

Wayne Burmas being duly sworn, deposes and says:

I am the President and CEO of FALL RIVER AREA REVITALIZATION., the Plaintiff in the within action. I have read the foregoing SUMMONS AND VERIFIED COMPLAINT and know the contents thereof. The same are true to my own personal knowledge, except as to those matters alleged on information and belief, and as to those matters, I believe them to be true. The basis of my personal knowledge and the matters alleged on information and belief includes the books and records in my possession and in the possession of my attorney.

Dated: 12-3-18

_____
WAYNE BURMAS

15

Subscribed and sworn to before me

this 3 day of 12 2018.

_____  Mary Lenti
NOTARY PUBLIC            NJ Attorney At Law
                         Bar ID 02993-2011

## CERTIFICATION OF SERVICE

I, __Mary Lenti, Esq__, certify that a copy of my motion was served
(Name of Moving Party)

by __Personal Service__ on __1/4/18__ upon:
(Mail, Personal Service, etc.)   (Date)

__City of Falls River__
(Name of Opposing Party)

__One Government Center__
__Fall River, MA 02722__

_____
(Address of Opposing Party)

_____
Name (Signature)